STANLEY S. ANDERSON, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
Anderson v. Commissioner
Docket No. 42053.
United States Board of Tax Appeals
28 B.T.A. 179; 1933 BTA LEXIS 1167; May 24, 1933, Promulgated *1167 In the absence of sufficient proof to overcome the presumption that the property acquired by the petitioner and his wife after marriage was community property under the laws of the State of California, held, that the income received by them in 1924 and 1925 from such property is taxable in its entirety to the petitioner as community income. Joseph D. Peeler, Esq., Melvin D. Wilsov, Esq., and E. P. Adams, C.P.A., for the petitioner. R. W. Wilson, Esq., for the respondent. SMITH *179 The respondent has determined deficiencies in petitioner's income tax for the calendar years 1924 and 1925 in the amounts of $19,036.61 and $9,752.59, respectively. The petitioner alleges that the respondent erred in including in his income all of the profits received in those years from certain real estate and other investments in which his wife had a separate one-half interest. FINDINGS OF FACT. The petitioner and his wife, Marguerite S. Anderson, citizens of the State of California, were married in 1914. The petitioner at that time was employed as assistant manager of the Beverly Hills Hotel, which was owned by his mother, Margaret Anderson, at *1168 a salary of $3,000 per annum. At the time of their marriage neither the petitioner nor his wife owned any property of consequence. The petitioner's employment with the hotel continued until the World War, when he went abroad. From 1914 to 1923, inclusive, the petitioner's wife acted as a hostess for the hotel, devoting all of her time to that business. Her duties were to provide entertainment and to arrange social functions for the guests and to secure new patrons. The hotel catered to the wealthy class. At the time of her marriage, the petitioner's wife received a gift of $5,000 from her father, J. H. Slattery. Thereafter, for five or six years, she received additional gifts from him aggregation about $20,000. This money was used for various purposes, including household expenses. In 1916 the petitioner's wife learned that a friend of hers was interested in buying an estate in the Beverly Hills section. She and the petitioner located a desirable piece of property and negotiated the *180 sale, receiving a commission of $10,000, which was paid to the petitioner, it being agreed between them, however, that the commission should belong one half to each. In May *1169 1916, the petitioner and his wife purchased five vacant lots in Beverly Hills at a total cost of $13,200, which amount they paid with the $10,000 commission referred to above and $3,200 which the petitioner's wife secured from her father. The deeds to the lots were taken in the petitioner's name and so remained until May 1932, when new deeds were made to the petitioner and his wife as tenants in common. While the petitioner was overseas and prior to his return in 1919 the petitioner's wife and his mother entered into an oral agreement whereby she, the petitioner's wife, and the petitioner, upon his return, were to take over the entire management of the hotel and were to receive a stipulated yearly salary of $3,000 plus one half of the net profits. As a consideration for this agreement the petitioner's wife was to render full time services to the hotel. It was specifically agreed that she would share equally with the petitioner the yearly salary and the profits, if any. Under this contract, the petitioner and his wife received profits over the period 1919 to 1923, inclusive, of approximately $140,000. This amount, together with the salary of $3,000 per year, was paid to the *1170 petitioner by checks drawn on the hotel by himself as manager, and was deposited by him in a joint bank account for himself and wife. In September 1923, the petitioner, with the knowledge and consent of his wife, entered into agreements with the Janss Investment Co. and Charles H. Christie for the acquisition of certain undivided interests in two real estate subdivisions. The contracts were signed by the petitioner and deeds were made out in his name. The total investment therein of the petitioner and his wife was approximately $56,000, which was paid, for the most part, out of the profits from the hotel. Soon after this transaction the petitioner's wife asked him to prepare a written memorandum defining his and her respective rights in the investment. Accordingly, the petitioner, on September 5, 1923, prepared and delivered to his wife the following letter: Confirming our conversation relative to the Janss Investment and Charlie Christie land deal. Charlie and I agree to purchase from Janss 120.5 acres for $180.750 (for one-half interest, Janss retaining one-half), payable $60,250. cash in September and October, and notes for the balance of $120,500. On this deal I to-day *1171 paid $5000. on the September installment. I also entered into an agreement to purchase from Charlie Christie a 1/4 interest in 107 acres, the total price of the acreage being $321,000. and our 1/4 will amount to $80,250. Under the agreement by which Charlie is buying this land from Janss he is to pay $107,000. cash and notes for $214,000. The cash payments are to be made in September *181 and October and I to-day paid $6250, which is 1/4 of the cash payment due in Sept. I understand from you that you agree to these transactions and agree to payment of your proportion of the cash payments from any funds now held jointly by us, and that you assume liability for your proportion of future payments, such liability to attach to your separate funds as well as those held jointly by us. It is the belief of Janss and Charlie that with the placing of this property on the market, the notes will be paid off from sales and we will not be called upon for cash to meet same. Should you for any reason have occasion, in my absence or in case of any misunderstanding arising later, to secure further details relative to this, Dr. J. will give you same. A copy of the above letter was *1172 filed at the office of the Janss Investment Co. and Charles H. Christie also was advised of its contents. In the Janss Investment Co.'s books an account was kept in the petitioner's name until January 1929, when the business was taken over by a newly organized corporation. In the books of the new company separate accounts were set up for the petitioner and his wife, showing them owners of separate equal interests. From time to time the petitioner and his wife made other investments with their joint earnings and profits, with the understanding and agreement that they were equal owners therein and that each was entitled to receive one half of the profits and was liable for one half of the losses. The petitioner's wife at all times took an active interest in the affairs of the real estate syndicate. She frequently discussed matters of policy with the managers and gave her approval to the plans for the development and sale of the property. She signed all the deeds and mortgages and other papers of that character. Edwin Janss, president of the Janss Investment Co., and Charles H. Christie both understood that Marguerite S. Anderson and the petitioner owned equal interests in *1173 their investment. In August 1926, the Janss Investment Co. deeded back to "Stanley S. Anderson and Marguerite S. Anderson" an undivided one-fourth interest in 37 acres of the syndicate property which had not been sold. In February 1924, the petitioner and his wife executed and delivered to Edwin Janss and Harold Janss a general power of attorney, which was duly recorded. On January 27, 1925, the petitioner's wife executed and delivered a similar power of attorney to the petitioner. In the latter part of 1924 the auditor for the Beverly Hills Hotel, upon request of the hotel bookkeeper, opened up a separate set of books for the petitioner as of January 1, 1925. Near the end of 1926 the petitioner inquired if his wife's share of the earnings from *182 the "Young's Building" were being credited to her and, being informed that they were not, had the auditor open an account entitled "Joint M. S. Anderson" in which was set up the Young's Building at a valuation of $202,788. Also, at about that time, another account was opened as of January 1, 1926, entitled "Janss Inv. Co. Joint M. S. Anderson." Also, at about that time, another account was set up for "Marguerite S. Anderson. *1174 " On June 8, 1932, the petitioner and his wife, upon the advice of her attorney, executed a memorandum agreement providing in part as follows: WHEREAS the parties hereto were married in 1914 and at the time of said marriage neither had any property, and shortly thereafter an agreement was made between them to the effect that all property acquired by either after the date of their marriage, whether separate or community, should be deemed to be and should constitute the property of both of them as tenants in common, each owning an undivided one-half interest therein; and WHEREAS about this time or shortly thereafter Mrs. Anderson received from her father, as a gift to her, various sums of money aggregating in all approximately $20,000.00, which she turned over to Mr. Anderson when and as received to invest under said agreement; and WHEREAS Mr. Anderson used said money, together with various earnings of both of them and various property which he received by gift from his mother, and proceeds and avails of all of said property, in purchasing, owning and selling real estate and other property, and for the purpose of convenience has carried the legal title to all property so acquired *1175 in his own name, but as trustee for himself and Mrs. Anderson as tenants in common, and said property has at all times constituted and does now constitute the property of the parties hereto as tenants in common, each owning an undivided one-half interest therein; and WHEREAS the parties desire to confirm the agreement between themselves hereinbefore referred to and to reduce the same to writing and thenceforward to have the legal title to all real property acquired by them during their said marriage, from whatever source, held in their joint names as tenants in common pursuant to said agreement; Now, THEREFORE, it is MUTUALLY AGREED by and between the parties hereto as follows: 1. All property whatsoever, whether separate or community, heretofore or hereafter acquired by either of the parties hereto since and during their marriage and howsoever the legal title thereto may be held, constitutes the property and is owned by them jointly as tenants in common, each owning an undivided one-half interest therein as his and her respective separate property, and none of said property, no matter how the legal title thereto may be held, is or shall be owned in any other way than as tenants *1176 in common, each owning an undivided one-half interest therein as his and her respective separate property. For the calendar years 1920 to 1923, inclusive, the petitioner and his wife filed joint returns which were prepared for them by the hotel auditor. The petitioner informed the auditor in 1920 that one half of the profits from the hotel belonged to his wife separately, *183 but the auditor advised him that it was necessary under the law and the Commissioner's regulations to report all the income in joint returns. For the years 1924 and 1925 the petitioner and his wife filed separate returns in which they each reported one half of their entire income. The respondent in his audit of the returns for 1924 and 1925 has held the petitioner liable for taxes upon the entire amount of the income reported in both the returns. The items of income which the petitioner alleges, in his amended petition, were erroneously included in his income and which are taxable to his wife are as follows: 1924
Interest from Notes, Mortgages, and Bank Deposits
$1,698.63
Rents from Real property
9,876.18
Profits on sales of stocks and real property
6,768.19
Dividends from stocks
2,000.00
Profit from joint ventures in real estate
29,506.56
Capital net gain
16,747.00
1925
Interest from Notes, Mortgages, and Bank Deposits
$964.78
Rents from real property
5,342.80
Dividends on stocks
4,751.83
Profit from joint ventures in real estate
28,541.55
Loss from joint ventures in real estate
2,162.89
*1177 OPINION. SMITH: The only question to be determined in this proceeding is whether the income received by the petitioner and his wife from certain joint investments in 1924 and 1925 is taxable in its entirety to the petitioner as community income under the laws of the State of California, or whether one half os such income is taxable to the petitioner's wife as her separate income. Under the law of the State of California, as it existed prior to enactment of section 161(a) of the California Civil Code (enacted April 28, 1927), all property acquired after marriage by either spouse constitutes community property except that acquired by gift, bequest, devise, or descent. California Civil Code, secs. 161-164. Likewise, the income from such property constitutes community income for which the husband is liable in respect to the Federal income tax. United States v. Robbins,269 U.S. 315; Blair v. Roth, 22 Fed.(2d) 932. Section 161(a) of the California Civil Code, which gives to the wife "present, existing and equal interests" in community property during continuance of marriage relations, and renders her liable for the Federal income tax *1178 on her separate share of the community income, United States v. Malcolm,282 U.S. 792, does not apply to property acquired prior to its enactment or affect the taxability of the income therefrom to the husband. Paul F. Hill et al., Executors,24 B.T.A. 1144; F. J. Carman,25 B.T.A. 162. As the respondent concedes, however, the respective interests of the husband and wife in community property and likewise community *184 income, with certain limitations as set forth in Lucas v. Earl,281 U.S. 111, are subject to change by contract between the husband and wife. Kaltschmidt v. Weber,145 Cal. 596; 179 Pac. 272; Wren v. Wren,100 Cal. 276; 34 Pac. 775; Larson v. Larson,15 Cal.Ap. 531; 15 Pac. 340; Smith v. Smith,47 Cal.Ap. 650; 191 Pac. 60; Francis Krull,10 B.T.A. 1096; W. A. Roth,22 B.T.A. 587; *1179 Blair v. Roth, supra. If the wife has a vested interest in the community property separate from that of her husband, the income therefrom is taxable to her in her separate returns. Poe v. Seaborn,282 U.S. 101. Was there such a contract between the petitioner and his wife and did the wife in 1924 and 1925 have a separate vested one-half interest in the property from which the income in dispute was to arise? Much of the evidence adduced by the petitioner was directed towards proving that his wife contributed equally with him to their joint earnings after marriage, including the $10,000 fee for negotiating the real estate sale in 1916, the salary and profits from the operation of the hotel, and the income from all other sources. Assuming that to be true, however, these earnings and the property acquired therewith might nevertheless belong to the community, for, as we have said above, under the laws of the State of California, all the property acquired after marriage by either spouse prior to the enactment of section 161(a) of the California Civil Code is presumed to be community property except that acquired by gift, bequest, devise, or *1180 descent. Of the $13,200 invested in the real estate lots in 1916, $3,200 was received by the petitioner's wife as a gift from her father and was therefore not community income. The evidence is to the effect that the petitioner's wife received approximately $20,000 from this source after her marriage to the petitioner. However, these funds were commingled with their other earnings and investments so that their identity was lost. See Pedder v. Commissioner, 60 Fed.(2d) 866; John H. Flach,13 B.T.A. 383. The petitioner and his wife both testified that there was an oral agreement between them that they should each own a separate one-half interest in all of their income and property. They testified that there was such an agreement with respect to the $10,000 fee received from the real estate sale in 1916, the salary and profits from the operation of the hotel during the years 1919 to 1923, inclusive, and all of their investments made with these and other funds. There is no written evidence of such an agreement with respect to any of their property prior to September 5, 1923, which is the date of the above letter from the petitioner to his wife *1181 regarding their investment in the Janss Investment Co. and Charles H. Christie real estate ventures. This letter does not purport to be, nor can it *185 be construed as, a valid assignment by the petitioner to his wife of any interest in these investments. It contains the statement: I [the petitioner] understand from you that you agree to these transactions and agree to payment of your proportion of the cash payments from any funds now held jointly by us, and that you assume liability for your proportion of future payments, such liability to attach to your separate funds as well as those held jointly by us. It is not shown to which joint funds or separate funds of his wife the petitioner referred. The letter is not signed by the petitioner's wife and was not executed as an agreement. We think that it has but little, if any, probative value. The deeds to the five real estate lots purchased in 1916 were taken in petitioner's name and so remained until May 1932, just prior to the hearing of this proceeding, which was on June 14, 1932, when they were changed to show the petitioner's wife the owner of a one-half interest in the property. *1182 Likewise, the investments in the real estate syndicates were recorded in the petitioner's name. The formally executed agreement defining the separate interests of the petitioner and his wife in all of their property, which is set out in part above, was not executed until June 8, 1932. This agreement, of course, has no retroactive effect and does not change the status of the income of the petitioner and his wife for the taxable years 1924 and 1925. W. A. Roth,17 B.T.A. 1330. The facts in this case are hardly distinguishable from those in Blair v. Roth, supra, in which the court held, reversing the Board, that notwithstanding an oral agreement between husband and wife that the earnings of both should be contributed to a common fund and that the surplus thereof, after payment of their personal and community expenses, should belong to them on an equal footing, the earnings of both spouses constituted "community income" taxable to the husband. In its opinion, the court said: * * * There was no writing, and the testimony of appellee and his wife, much of which was elicitated by highly leading questions, was to the effect that, shortly after *1183 their marriage, they had an understanding, not that the earnings of each should constitute the separate property of the earner, but that the earnings of both should be contributed to a common fund, of which they were to be the owners, share and share alike. They referred to themselves as equal partners in all they had or should acquire, jointly or severally. * * * * * * As exemplified in actual practice, the agreement of the appellee and his wife amounted to substantially this: They would contribute their earnings to a common fund, out of which their personal and community expenses would be paid, and of the savings, if any, and the property in which such savings were invested, they were to be the owners upon an equal footing. By the appellant it is not contended that, under the California statutes (sections 159, 160, Civ. Code; Wren v. Wren,100 Cal. 276, 34 P. 775, 38 Am.St.Rep. 287; Kaltschmidt *186 v. Weber,145 Cal. 596; 179 P. 272; Smith v. Smith,47 Cal.App. 650, 191 P. 60; *1184 Perkins v. Sunset T. & T. Co.,155 Cal. 712, 103 P. 190), a husband and wife domiciled in that state may not make valid agreements relating to either their separate or their community property, or that it would be incompetent, by appropriate agreement between them, to constitute the earnings of the wife her separate estate. In essence his contention is that, at most, the agreement here was for an assignment by each of the parties of one-half of his or her earnings to the other; that, at the instant they were received, the salaries were, by the law, impressed with the status of community property, and were taxable with reference to that status; and that the obligation to pay the tax so computed could not be escaped by contributing such incomes to the so-called partnership between the two members of the community, any more effectually than by contributing it to a like enterprise as between one member of the community and a third person. In this view we concur. The petitioner herein testified, upon interrogation by his counsel, as follows: Q. Did you have an agreement in advance as to how the commission was to be split? A. Yes, sir. When we got the commission *1185 we agreed to go fifty-fifty. Q. She was to have half as her separate property? A. Yes, sir. * * * Q. At the time you purchased those lots [the five vacant lots purchased in 1916] there was a definite agreement with Mrs. Anderson how the property interest was to be? A. She had a one-half interest and I owned the other half. Q. How were the deeds taken? A. The deeds? Q. To whom? A. In my name. Q. She knew that? A. No, she didn't know until three or four weeks ago. * * * Q. You had an arrangement with Mrs. Anderson as to how the profits and salary [from the operation of the hotel] would be divided? A. She made the arrangement with mother. Q. Did you have an arrangement with your wife? A. When I came home, yes. Q. What arrangement did you make with your wife? A. She was to work with me, I was to have half and she was to have half. Q. As separate property? A. As her own money. * * * Q. You bought other real estate? A. Bought and sold. Q. As I understand the situation, the title to the various lots were taken in your name? A. Yes, sir. Q. Did Mrs. Anderson know it? A. She didn't know until *1186 about two weeks ago. * * * Q. So that every investment you made was a joint agreement? A. Yes, sir. *187 Q. Was there any agreement between you and Mrs. Anderson as to how the property was to be held, that is, whether she had any interest? A. She understood she had a half interest. Q. A half interest in each property? A. Everything I had or we acquired between us. In Pedder v. Commissioner, supra, the Circuit Court of Appeals for the Ninth Circuit held, affirming the Board, upon facts similar to those in the instant case and those in Blair v. Roth, supra, that the presumption of the law of the State of California in favor of community property was not overcome. See also W. A. Roth,22 B.T.A. 587, in which the Board, also under similar facts, followed Blair v. Roth, supra.
Aside from the presumption of law which, as we have said, operates in favor of the respondent's contention that the income in question was community income, the very nature of the question here calls for the strictest proof on the petitioner's part. Where, as in the instant case, the written records *1187 and the acts of the husband and wife for a number of years indicate that, either ill-advisedly or without knowing the result upon their tax liability, they have submitted to the community property rule of their state, they should not be permitted to avoid the legal consequences of that rule merely upon their own testimony that they had previously entered into an oral agreement between themselves by which their property rights must be determined upon some other than the community property basis. We can not escape the conviction that this is the tenor of the cases in which the courts have considered this question. Upon the evidence before us, we are not convinced of the existence of any valid enforceable agreement between the petitioner and his wife, prior to the written agreement executed on June 8, 1932, that their income and property should be owned by them otherwise than "on an equal footing" as in Blair v. Roth, supra. We are therefore of the opinion that the petitioner has not overcome the presumption of the correctness of the respondent's determination that the income in question for the years 1924 and 1925 was community income taxable to the petitioner. *1188 Reviewed by the Board. Judgment will be entered for the respondent.
GOODRICH GOODRICH, dissenting: I disagree with the majority opinion, for the evidence herein convinces me that a contract existed between petitioner and his wife under which each acquired and held, as tenants in common, a separate one-half interest in these properties, and, consequently, the income therefrom should be taxed, one half separately to each of them. LANSDON AND BLACK agree with this dissent.